HUNTER, Jr., Robert N., Judge.
Col. Francis X. De Luca USMCR (Ret) appeals from an order entered by the North Carolina Utilities Commission concluding Fresh Air Energy II, LLC is not a "public utility" within the meaning of N.C. Gen. Stat. § 62-3(23) and subject to the Commission's jurisdiction, when it entered into an agreement to sell all of its solar-generated electricity to Duke Energy Carolinas, LLC, which will then sell electricity to its customers. We affirm.
I. Factual and Procedural Background
On 18 May 2017, Col. Francis X. De Luca USMCR (Ret) ("Plaintiff") filed a request for a declaratory ruling with the North Carolina Utilities Commission ("Commission"). Specifically, Plaintiff requested the Commission declare Fresh Air Energy II, LLC ("Fresh Air") a public utility. Plaintiff argued Fresh Air met the definition of a public utility defined in N.C. Gen. Stat. § 62-3(23)"because the company will produce electricity '... to or for the public for compensation ...' " by selling it to Duke Energy Carolinas, LLC ("Duke Energy"). Plaintiff further asserted if the Commission declared Fresh Air a public utility, he could access "information ... crucial" to "determin[ing] the true costs of solar power" in North Carolina.
On 18 May 2017, the Commission requested comments via petitions to intervene and initial comments, specifically requested comments from the Commission's Public Staff, allowed Plaintiff to file reply comments, and made Fresh Air a party to the docket. On 31 May 2017, the Commission allowed the North Carolina Sustainable Energy Association ("NCSEA") to intervene in the proceeding.
Responding to the Commission's request for public comment, Fresh Air filed comments on 1 June 2017. Fresh Air argued it was not a public utility because it constituted a "Qualifying Facility" ("QF") under the federal Public Utility Regulatory Policies Act of 1978 ("PURPA"), and thus was exempt from certain federal and state laws. Fresh Air claimed under federal law it could not sell solar energy to the public because "[t]he objective of PURPA is to ensure ... ratepayers remain financially indifferent as to whether the electric utility generates the electricity itself or purchases the electricity from a QF." Fresh Air further asserted it was not a public utility under N.C. Gen. Stat. § 62-3(23) because it will not furnish electrical output "to or for the public"; rather, its output will be sold only to Duke Energy, which will then sell electricity to its customers.
On 2 June 2017, the Public Staff of the Commission filed comments. The Public Staff noted Fresh Air is a QF under PURPA, requiring the electric public utilities to purchase the output of QFs "at the utilities' avoided cost rates." Further, the Public Staff argued Fresh Air is not a public utility under North Carolina law, because the sale of Fresh Air's electricity is not "to or for the public for compensation" pursuant to N.C. Gen. Stat. § 62-3(23)(a)(1). Rather than serving as a distributor, Fresh Air is an "independent contractor, interested only in selling its electricity to [Duke Energy]" and "has no interest in what happens to the electricity after the electricity is sold to [Duke Energy]."
Intervenor NCSEA also filed comments on 2 June 2017. NCSEA's arguments included: (1) Fresh Air "is not producing electricity 'to or for the public' "; (2) Fresh Air is a QF under PURPA and is not a public utility under North Carolina law; (3) the costs Plaintiff believes to be unknown are in fact known or are accessible to pertinent agencies and decision-makers; and (4) "public policy should dictate that independent power producers are not public utilities."
On 22 August 2017, the Commission declared Fresh Air is not a public utility within the meaning of N.C. Gen. Stat. § 62-3(23). Plaintiff then filed a notice of appeal and exceptions on 20 September 2017.
II. Jurisdiction
The Commission's order was a final judgment. Appeal to this Court is proper pursuant to N.C. Gen. Stat. § 62-90(a) (2017), N.C. Gen. Stat. § 7A-29(a) (2017), and Rule 18 of the North Carolina Rules of Appellate Procedure.
III. Standard of Review
The dispositive issue on appeal is whether the Commission correctly determined Fresh Air is not operating as a "public utility." See State ex rel. Utils. Comm'n v. N.C. Waste Awareness and Reduction Network ("NC WARN "), --- N.C. App. ----, ----, 805 S.E.2d 712, 714 (2017), aff'd. per curiam --- N.C. ----, 812 S.E.2d 804 (2018) (Mem.) (quoting State ex rel. N.C. Utils. Comm'n v. New Hope Rd. Water Co. , 248 N.C. 27, 29, 102 S.E.2d 377, 379 (1958) (" 'The Commission has no jurisdiction over these respondents unless they are public utilities within the meaning of the Public Utilities Act.' ") (alterations omitted). An appellate court may reverse the North Carolina Utilities Commission if an appellant's rights have been prejudiced because the Commission's decision was affected by an error of law. N.C. Gen. Stat. § 62-94(b)(4) (2017). The issue is a question of law reviewed de novo by our Court. NC WARN , --- N.C. App. at ----, 805 S.E.2d at 714 ; N.C. Gen. Stat. § 62-94(b) ("[T]he court shall decide all relevant questions of law [and] interpret constitutional and statutory provisions ....") ).
IV. Analysis
Plaintiff argues the Commission erred by determining Fresh Air was not a "public utility" pursuant to the plain meaning of the Public Utilities Act. Because all of Fresh Air's electricity production will enter the public grid, Plaintiff contends it "falls squarely under the definition of 'public utility' " pursuant to N.C. Gen. Stat. § 62-3(23)(a)(1) (2017). Plaintiff further argues federal law does not preempt state law, thus removing Fresh Air from the Commission's oversight, nor does it bar State regulation of Fresh Air as a public utility. Defendants argue, conversely, Fresh Air is not a "public utility," where it "does not sell electricity 'to or for the public' " and because of its status as a QF.
"When construing a statute, the court looks first to its plain meaning, reading words that are not defined by the statute according to their plain meaning as long as it is reasonable to do so[.]" State ex rel. Utils. Comm'n v. Envir. Defense Fund , 214 N.C. App. 364, 366, 716 S.E.2d 370, 372 (2011) (citations omitted); see also State ex rel. Utils. Comm'n v. N.C. Sustainable Energy Ass'n ("NCSEA "), --- N.C. App. ----, ----, 803 S.E.2d 430, 432 (2017). "The court must give effect to the plain meaning as long as the statute is clear and unambiguous." Id. , 214 N.C. App. at 366, 716 S.E.2d at 372 (citation omitted). "[T]his Court cannot 'delete words used or insert words not used' in a statute." NCSEA , --- N.C. App. at ----, 803 S.E.2d at 433 (quoting Lunsford v. Mills , 367 N.C. 618, 623, 766 S.E.2d 297, 301 (2014) ). Further, "statutes relating to the same subject or having the same general purpose, are to be read together, as constituting one law ... such that equal dignity and importance will be given to each." Taylor v. City of Lenoir , 129 N.C. App. 174, 178, 497 S.E.2d 715, 719 (1998) (citation and quotation marks omitted).
The Public Utilities Act, found in Chapter 62 of the North Carolina General Statutes, mandates "[t]he Commission shall have and exercise such general power and authority to supervise and control the public utilities of the State as may be necessary to carry out the laws providing for their regulation[.]" N.C. Gen. Stat. § 62-30 (2017). The Commission has oversight of "public utilities" because "the rates, services and operations of public utilities as defined herein, are affected with the public interest[.]" N.C. Gen. Stat. § 62-2(a) (2017).
As defined in the Act, a "public utility" is "any entity which owns and operates 'equipment and facilities' that provides electricity 'to or for the public for compensation.' " NC WARN , --- N.C. App. at ----, 805 S.E.2d at 714 (quoting N.C. Gen. Stat. § 62-3(23)(a)(2015) ).
Undisputed here is that Fresh Air owns and operates a solar panel system-i.e. , equipment-that produces electricity. Duke Energy compensates Fresh Air for the electricity produced. The question, however, is whether in producing energy that is sold to Duke Energy, Fresh Air is producing electricity "to or for the public," thus making it a "public utility."
The Act explains in subsection (a):
the term "public utility" shall not include persons who construct or operate an electric generating facility, the primary purpose of which facility is either for (i) a person's own use and not for the primary purpose of producing electricity, heat, or steam for sale to or for the public for compensation[.]"
N.C. Gen. Stat. § 62-3(23)(a)(1). In subsection (b) the Act then broadens the definition for ratemaking, stating: "The term 'public utility' shall for rate-making purposes include any person producing, generating or furnishing any of the foregoing services to another person for distribution to or for the public for compensation." N.C. Gen. Stat. § 62-3(23)(b) (2017). Thus, those who are exempt from the definition of "public utility" in subsection (a)(i) and who secondarily provide power "to or for the public for compensation"-fall within the definition of "public utility" under subsection (b). See N.C. Gen. Stat. § 62-3(23) (a) and (b).
Early on, our Supreme Court placed parameters around what constitutes a "public utility," subject to regulation by the Commission. See e.g. , New Hope , 248 N.C. at 30, 102 S.E.2d at 379 (stating "the true criterion by which to determine whether a plant or system is a public utility is whether or not the public may enjoy it of right or by permission only") (citations omitted); Util. Comm'n v. Carolina Tel. and Tel. Co. , 267 N.C. 257, 268, 148 S.E.2d 100, 109 (1966) (stating "[o]ne offers service [to] the 'public' within the meaning of th[e] statute when he holds himself out as willing to serve all who apply up to the capacity of his facilities").
In New Hope , our Supreme Court sought to answer the sole question: "whether or not the respondents are public utilities within the meaning of G.S. 62-65(e) 2[.]" Id. at 29, 102 S.E.2d at 379. The respondents, New Hope Water Company ("New Hope"), constructed a water main line connecting the municipal lines to their properties and permitted others to tap in for a fee. Id. at 29, 102 S.E.2d at 379. Purchasers of the taps would then show proof of their purchase to the municipality, which would then install meters and furnish water. Id. , 248 N.C. at 29, 102 S.E.2d at 379.
Examining subsection 2 of the statute, the Court stated: "The term 'public utility,' when used in this article, includes persons or corporations [...] owning or operating in this State equipment or facilities for: Diverting, developing, pumping, impounding, distributing or furnishing water to or for the public for compensation." Id . at 29, 102 S.E.2d at 379 (citing N.C. Gen. Stat. § 62-65(e) 2) ). The Court explained the "legal obligation" of a "public utility" requires
serv[ing] the members of the public to whom its use extends, impartially and without unjust discrimination ... A public utility must serve alike all who are similarly circumstanced with reference to its system, and favor cannot be extended to one which is not offered to another, nor can a privilege given to one be refused to another
Id. at 30, 102 S.E.2d at 379 (citation and quotations omitted). Where New Hope owned the lines and sold taps, but sold no water to anyone at any time, the Court held the respondents were not public utilities within the meaning of the statute. Id. at 31, 102 S.E.2d at 380.
Attempting to define "public" in the context of utilities companies, our Supreme Court considered whether a mobile radio telephone service was a public utility. Telegraph Co. , 267 N.C. at 268, 148 S.E.2d at 109. The applicant wished to provide service in the Kinston area and obtained a Federal Communications Commission construction permit allowing for 45 customers. Id . at 268, 148 S.E.2d at 109. Although the planned operation expected to service 33 subscribers and was located in only one community, the Supreme Court held it was a public utility. Id. at 268, 148 S.E.2d at 109. Core to the Court's decision was the following:
One offers service [to] the "public" within the meaning of [the] statute when he holds himself out as willing to serve all who apply to the capacity of his facilities. It is immaterial, in this connection, that his service is limited to a specified area and his facilities are limited in capacity.
Id. at 268, 148 S.E.2d at 109. Because the applicant offered his company's services to anyone who applied, to the limit of its capacity, our Supreme Court determined it to be an offering of the service to the "public." Id. at 268, 148 S.E.2d at 109.
Our Supreme Court explained "[t]he public does not mean everybody all the time" and examined what constitutes a public utility by considering "whether the service it offered was for the 'public.' " State ex rel. Utils. Comm'n v. Simpson , 295 N.C. 519, 522, 246 S.E.2d 753, 755 (1978) (quotations omitted). In Simpson , Dr. Simpson offered a two-way radio service to members of his County Medical Society. Id. at 520, 246 S.E.2d at 754. Dr. Simpson's service, licensed by the Federal Communications Commission, was an adjunct to a telephone answering service and would serve a group of 55-60 persons. Id .at 521, 246 S.E.2d at 754-55. To answer its question, the Court relied on relevant statutory language:
"Public utility" means a person ... owning or operating in this State equipment or facilities for .... Conveying or transmitting messages or communications by telephone or telegraph, or any other means of transmission, where such service is offered to the public for compensation.
Id. at 521, 246 S.E.2d at 755 (quoting N.C. Gen. Stat. § 62-3(23) a.6) (emphasis supplied in Simpson ) ). The Court explained as core to the "public" nature of services the "willing[ness] to serve all who apply up to the capacity of [the] facilities." Id. at 522, 246 S.E.2d at 755 (quoting Telegraph Co. , 267 N.C. at 268, 148 S.E.2d at 109 ). The Court instructed "whether any given enterprise is a public utility within the meaning of a regulatory scheme does not depend on some abstract, formulistic definition of 'public' to be thereafter universally applied." Id . at 524, 246 S.E.2d at 756. Rather, "[w]hat is the 'public' in any given case depends ... on the regulatory circumstances of that case." Id .at 524, 246 S.E.2d at 756. Enumerated by the Court as "circumstances" to consider are:
(1) nature of the industry sought to be regulated; (2) type of market served by the industry; (3) the kind of competition that naturally inheres in that market; and (4) effect of non-regulation or exemption from regulation of one or more persons engaged in the industry.
Id. at 524, 246 S.E.2d at 756. Flexible interpretation is key, as it "is necessary to comport legislative purpose with the variable nature of modern technology." Id . at 524, 246 S.E.2d at 757. The Supreme Court held Dr. Simpson's service was offered to the public within the meaning of N.C. Gen. Stat. §§ 62-3(23) and 62-119 and subject to regulation by the Commission. Id. at 525, 246 S.E.2d at 757 (citing N.C. Gen. Stat.§§ 62-3(23) and 62-119 ) ).
More recently, this Court determined whether the North Carolina Waste Awareness and Reduction Network ("NC WARN") produced electricity "for the public," thereby rendering the company a "public utility." NC WARN , --- N.C. App. at ----, 805 S.E.2d at 714. NC WARN owned and operated a system of electricity producing solar panels, receiving compensation from a church in payment for the electricity produced. Id. at ----, 805 S.E.2d at 714. Because NC WARN sought "to provide affordable solar electricity to non-profits," including "similar projects to other non-profits in the future," we determined the company "serves, or seeks to serve, a subset of the population[.]" Id. at ----, 805 S.E.2d at 715. The company "offered to provide all of the energy produced by the solar system located on the Church's roof to the Church itself," and thus was "willing to serve the Church up to the full capacity of NC WARN's facility[.]" Id. at ----, 805 S.E.2d at 720 (n. 2). Looking to Simpson , this Court explained:
NC WARN desires to serve customers of its own choosing within Duke Energy's territory at whatever rates and service requirements it sets for itself without oversight. Although NC WARN at the present date is only providing its services to a small number of organizations in the Greensboro area, if it were allowed to generate and sell electricity to cherry-picked non-profit organizations throughout the area or state, that activity stands to upset the balance of the marketplace. Specifically, such a stamp of approval by this Court would open the door for other organizations like NC WARN to offer similar arrangements to other classes of the public, including large commercial establishments, which would jeopardize regulation of the industry itself.
Id. at ----, 805 S.E.2d at 716.
This Court further reasoned "whether an entity is selling energy to the 'public' ultimately hinges on ... what accomplishes the legislature's purpose and comports with public policy[.]" Id. at ----, 805 S.E.2d at 716 (citing Simpson , 295 N.C. at 524, 246 S.E.2d at 756-57 ) ). The Public Utilities Act proclaims in its declaration of policy the " 'inherent advantage of regulated public utilities[.]' " Id . at ----, 805 S.E.2d at 716 (alterations in original) (quoting N.C. Gen. Stat. § 62-2(a)(2) ). Such monopolistic regulation allows for reliability and sufficiency of electric power to the people of North Carolina and best serves the public. Id . at ----, 805 S.E.2d at 716 (citing N.C. Gen. Stat. § 62-2(b) (2015) ); see also Telegraph Co. , 267 N.C. at 271, 148 S.E.2d at 111.
A parallel policy identified by the General Assembly is " '[t]o promote the development of renewable energy and energy efficiency.' " Id . at ----, 805 S.E.2d at 716 (alterations in original) (quoting N.C. Gen. Stat. § 62-2(a)(10) ). Nonetheless, "statutory pronouncements of policy are meant to coexist with North Carolina's well-established ban on third-party sales of electricity rather than supersede it until such time as the monopoly model is abandoned by our legislature." Id . at ----, 805 S.E.2d at 717 (citing Taylor v. City of Lenoir , 129 N.C. App. at 178, 497 S.E.2d at 719 ) ). Based on legislative intent, public policy, and Simpson factors, this Court held NC WARN was "operating as a public utility" pursuant to N.C. Gen. Stat. § 62-3 and "subject to regulation by the Commission." See id. at ----, 805 S.E.2d at 717.
Here, it is not Fresh Air's primary purpose to produce energy for itself; rather, it produces energy solely for purchase by Duke Energy, a single, regulated, public utility. As an independent contractor selling energy to Duke Energy, Fresh Air has no concern or interest where or to whom the electricity goes after selling it to Duke Energy. In this instance, after purchasing energy from Fresh Air, Duke Energy then sells to the public. It is of no concern to Fresh Air, however, as to what Duke Energy does with the power it purchases from Fresh Air. Nothing in the record indicates an opportunity exists for all of the public to enjoy Fresh Air's electricity production, either by right or by permission. See New Hope , 248 N.C. at 30, 102 S.E.2d at 379. Nor does the record indicate Fresh Air is willing to serve all who apply, up to the capacity of its facility. See Telegraph Co. , 267 N.C. at 268, 148 S.E.2d at 109 ; see also Simpson , 295 N.C. at 521, 246 S.E.2d at 755. Additionally, Fresh Air does not offer its electrical output to the public for compensation. See Simpson , 295 N.C. at 521, 246 S.E.2d at 755.
We decline here to take a formulistic approach and instead consider multiple factors. See id. at 524, 246 S.E.2d at 756. Unlike the utility provider in Simpson , who offered a two-way radio service to members of a County Medical Society, see id. at 522, 246 S.E.2d at 755, and unlike the utility provider in NC WARN , who produced electricity for a church and sought to serve a subset of the population of its own choosing, see NC WARN , --- N.C. App. at ----, 805 S.E.2d at 716, Fresh Air has a single customer: Duke Energy. We do not read the definition of public utility to include a facility that not only sells the totality of its output to a single regulated utility, but who also has no apparent plan or desire to expand its offering to other entities.
We also consider the factor of competition in the marketplace. See Simpson , 295 N.C. at 524, 246 S.E.2d at 756. North Carolina law establishes regional monopolies on the sale of electricity, which precludes retail electric competition and helps to prevent marketplace "duplication of investment, economic waste, inefficient service, and high rates." See NC WARN , --- N.C. App. at ----, 805 S.E.2d at 715. In stark contrast to the activities in NC WARN that were in direct competition with Duke Energy's services, where both entities sold kilowatt hours of electricity to Duke Energy's customers, Fresh Air's activities in the instant case support-rather than conflict with-Duke Energy's activities. As well, in looking to the effect of non-regulation or exemption from regulation of Fresh Air by the Commission, see Simpson , 295 N.C. at 524, 246 S.E.2d at 756, we see no threat to the public where, Duke Energy, the sole purchaser of the electricity, is regulated.
While we are sympathetic to Plaintiff's argument that the words "for the public" should be interpreted as to their plain and ordinary meaning, we cannot go so far here as to say that selling to a singular, regulated client who then sells the power to the public is the equivalent of Fresh Air producing energy for the public. Duke Energy, a regulated utility, is in control of the power it purchases from Fresh Air. Although Duke Energy currently sells the power to the its public customers, it could use the power in its own operations. That Duke Energy engages in the subsequent sale of the power it purchases, whether relied on or not by Fresh Air, does not automatically bring Fresh Air under the statutory definition of a public utility.
Finally, our decision comports with legislative purpose, see NC WARN , --- N.C. App. at ----, 805 S.E.2d at 716, where it will not infringe on monopolistic regulation of electric power production, see N.C. Gen. Stat. § 62-2(a)(2), and will promote renewable energy development and efficiency, see N.C. Gen. Stat. § 62-2(1)(10) (2017). For the reasons stated above, we affirm the Public Utilities Commission's order.
AFFIRMED.
Report per Rule 30(e).
Judges ELMORE and STROUD concurs.